Filed 3/11/15  In re L.A. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re L.A., a Person Coming Under the Juvenile Court Law. | B256028 (Los Angeles County Super. Ct. No.CK98887) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. MARLENE A., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Phillip L. Soto, Judge.  Reversed and remanded with directions.

Catherine C. Czar, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

Marlene A. (mother) appeals from the dependency court's orders terminating the court's dependency jurisdiction over her daughter, L.A., giving joint legal and physical custody of L.A. to mother and Hector A. (father),[1] and ordering the parents to work out a schedule regarding custody. Mother contends the court abused its discretion in awarding joint custody to father and allowing him to have unmonitored contact with L.A., because previously he had only monitored contact, L.A. indicated she was afraid of him, and circumstances had not substantially changed since the court's finding of abuse by father precipitated L.A.'s removal from his custody. Moreover, mother claims it was unreasonable to leave the specifics of custody for the parents to work out where they had repeatedly demonstrated an inability to work together or put their daughter's interests ahead of their own contentious custody dispute. We reverse and remand this matter to the dependency court to either retain jurisdiction or issue appropriate exit orders regarding custody and visitation consistent with this opinion and the current circumstances of the case.

## FACTUAL AND PROCEDURAL HISTORY

### A. Initial Investigation and Detention

Mother and father are parents of L.A., as well as two older daughters, M.A. and E.A. The parents separated in 2009; thereafter, L.A. was in the primary care of father until he suffered a stroke in March 2012. Mother then obtained custody of L.A. and M.A. through a family law order, with reasonable visitation to father. Since their separation, the parents have engaged in a lengthy, contentious custody dispute. That dispute included five prior reports of abuse to the Department of Children and Family Services (DCFS) between 2009 and 2012, at least three of which were made by mother or father against the other parent, and all of which were closed as unfounded or inconclusive.

---

[1] Father is not a party to this appeal.

2

The case most recently came to the attention of DCFS on February 9, 2013, as a result of a third-party call alleging emotional abuse of L.A. (then nine years old) and M.A. (then 17 years old) by their mother and father and "general neglect by the mother." The reporting party related statements by L.A. that she had witnessed a "Domestic Violence incident" earlier that day, when father came to pick up L.A. for a pre-arranged outing. Mother reportedly refused to let the visit proceed unless father gave her $4,000 and then began "yelling" at father when he arrived at the home. L.A. stated that during this incident she became "[n]ervous and scared and my stomach ached." L.A. further stated that her parents fought all the time, that mother "yells at me all the time and she spanks me on my butt with her hand," and that mother "goes out with her friends all the time," leaving L.A. in the care of her older sisters, who do not feed her. The caller also reported that, later that day, L.A. was taken by father to the emergency room complaining of "stomach pain and heart palpitation." It appeared that her symptoms were related to the earlier altercation between mother and father. The hospital social worker reported that L.A. was "especially concerned about her father's health condition and only relaxed when she was notified father's health was not [in] jeopardy." The hospital social worker further noted that L.A. appeared "sad and anxious" because she was not living with father.

The assigned Children's Social Worker (CSW) reported that mother refused to cooperate with the initial DCFS investigation, was "hostile and accusatory" toward the CSW, and refused to comply with DCFS's recommendations. After mother requested an "emergency meeting," the CSW arranged a team decision-making meeting on March 21, 2013. However, mother then refused to attend, stating that she "will not accommodate" the social workers' schedules.

The CSW spoke to L.A.'s school principal, who noted L.A.'s parents repeatedly "make allegations against each other" and called it the "second most horrible custody dispute" she had experienced in her career. L.A.'s grades declined around the time her father suffered his stroke, and her tardiness and absences increased while living with mother. L.A.'s teacher described her as a "sweet" and "cooperative" child who

3

"internalizes" her concerns. As for her academic performance, L.A. was reported to be at/above proficiency levels during the 2011-2012 academic year (while mostly living with father) with a decrease to "almost" proficient level in the 2012-2013 academic year (while living with mother). She also had "excessive" tardiness and absences in 2012.

The CSW interviewed L.A. at school on February 15, 2013. L.A. appeared "shy and withdrawn" but answered the questions "quickly and coherently." L.A. stated mother worked during the week and did not spend much time with her, leaving her in the care of her older sisters. While she indicated they always had food at home, L.A. said sometimes she stayed hungry because she did not like the food her mother or sisters prepared. L.A. stated that mother disciplines her by "yelling" or spanking her with an open palm over her clothing. L.A. denied witnessing physical aggression between her parents, but described incidents of each parent speaking negatively about the other parent to her and stated that mother "yells" at father and father "raises his voice sometimes" to mother, and that she gets scared when her parents argue. L.A. told the CSW she would like to live with father and does not like living with mother because her sisters are "mean" and "yell" at her. In a second interview on March 15, 2013, L.A. reported her sisters hit her on the head and mother does not intervene.

M.A., the middle sister, presented to the CSW as a "responsible and mature" child. She lived with father (along with L.A.) for three years, an experience she described as "abusive," and noted he would "alienate" her from mother. M.A. stated that since father's stroke, he had become more "controlling" and "agitated," with poor impulse control, including an incident in August 2012, when he attempted to hit her older sister, E.A., with a cane. M.A. reported that while the children lived with father, he would hit them with a belt, and then, "when told by DCFS CSWs that it is against the law, he began slapping them across the face leaving red marks." M.A. denied any physical discipline by mother. She has lived with mother since June 2012 and described their relationship as "rocky" but without major conflict. According to M.A., L.A. returns from visits with father as "the 'nastiest' child," and although she provides food for L.A. while babysitting, if L.A. "is not offered what she wants, she will refuse to eat."

4

Father told the CSW he had moved to Utah recently and was visiting the children about once a month. He denied domestic violence with mother and denied physically disciplining the children, but complained that mother had mental illness and had slapped him. During her interview, mother "expressed a lot of anger toward father" and complained that he should not have custody of the children because he was an "illegal immigrant" and had a criminal history, including incarceration for arson. She claimed there was ongoing domestic violence by father during their marriage. Mother acknowledged that L.A. needed to be in therapy but stated she could not afford the co-payments and also complained that father was against it. She stated that when L.A. returned from visits with father L.A. would start "screaming and yelling" and "demanding answers from the family." When asked about L.A.'s decline in academic performance and attendance, mother made excuses but "appeared to have little to no insight about the emotional impact the parents' volatile relationship has created" for L.A.

L.A. was detained from mother on April 2, 2013, and released to father. The CSW notified mother prior to the removal; mother began "yelling and screaming" at the CSW and demanded to know why she was being "punished." Mother then arrived at L.A.'s school during the detention and was "verbally aggressive" and "hostile" to the CSW in L.A.'s presence. When asked how she felt about mother's behavior, L.A. stated, "I was scared that she might take me away," and that she always wanted to live with father.

*B. Section 300 Petition and Detention Hearing*

On April 5, 2013, DCFS filed a petition under section 300, subdivisions (a), (b), and (j),[2] alleging L.A.[3] came within the jurisdiction of the dependency court because of the parents' history of "engaging in violent altercations" in L.A.'s presence, mother's

---

[2]    Further statutory references are to the Welfare and Institutions Code unless otherwise specified.

[3]    M.A. was 17 years old at the time the petition was filed but DCFS declined to file a petition on her behalf, stating that M.A. reported "feeling safe and intact in the home of the mother." E.A., the eldest daughter, was then 21 years old.

5

history of mental and emotional problems and refusal to seek mental health services, and a history of father physically abusing L.A.'s sibling, M.A.

In the detention report, the CSW noted that L.A. "appeared happiest" when placed in father's care. Father provided DCFS with a copy of mother's medical/psychological report from January 2007, showing that mother was diagnosed with "Adjustment Disorder with Mixed Anxiety and Depressed Mood, chronic, in partial remission." In the detention report, the CSW noted mother's continued "pattern" of reacting in a "defensive, aggressive and hostile" manner, as well as verbal threats and attempted intimidation of the CSW. Mother also had been placed on an involuntary psychiatric hold for suicidal ideation in 2009, and failed to "follow through to receive any mental health services" upon discharge.

DCFS concluded that L.A.'s "functioning has been impaired" since living with mother, as evidenced by her "psychosomatic symptoms" (including heart palpitations, stomach pain, anxiety and sadness) and her academic decline, and that the risk of "future child maltreatment is high should the child remain in the care of the mother." Although there was an open case in family law court related to the parents' dissolution proceedings, the detention report noted that "the situation has not been resolved over the years and is of most concern to the Department since [L.A.] continues to endure emotional instability in the home of the mother and her functioning continues to deteriorate." DCFS therefore recommended continued detention.

At the April 5, 2013, detention hearing, the juvenile court found a prima facie case was established for detaining L.A. pursuant to section 300, subdivisions (a), (b) and (j). The court released L.A. to father pending the next hearing and granted monitored visits with mother.

DCFS filed a first amended petition on April 29, 2013, adding an allegation under section 300, subdivision (c), that the parents' "on-going custody dispute" placed L.A. at "substantial risk of suffering serious emotional damage as evidenced by severe anxiety, depression, withdrawal and untoward aggressive behavior towards self and others." The

6

amended petition did not include the allegations under section 300, subdivision (j), regarding father's alleged abuse of M.A.

### C. Adjudication

DCFS filed its jurisdiction/disposition report ("jurisdiction report") on April 29, 2013, detailing further interviews with the family. In an interview on April 11, 2013, L.A. reported that she had been "generally happy" living with her mother but did not like being left alone with her sisters, as they would get into fights. L.A. denied physical abuse by mother but stated that mother "tried to spank me with her hand" a few times. She denied witnessing domestic violence between her parents. When asked about the incidents on February 9, 2013, L.A. stated that her mom "wouldn't let me go with my dad" until he gave her money, and that once mother allowed L.A. to leave, father told her they were going to the hospital, although she denied feeling sick at the time and "didn't think I needed to go." L.A. stated she felt safe living with father and wanted to remain there. When asked if she wanted to live with mother, "she just shrugged her shoulders." She stated she wanted to speak to and see her mother, but father said she could not call mother "because the Court said." L.A. further reported seeing her older sister, M.A., being hit by father, and that L.A. had been slapped and hit with a belt by father. L.A. denied having any marks or bruises.

Mother stated she was subject to domestic violence from father and that he would "discipline [the children] in harsh ways." Mother denied refusing to allow L.A. to see father unless he paid her money and said father had sent her text messages calling her a "whore," saying she just wanted money, and threatening to kill her. With respect to her mental health history, mother stated she received treatment from a psychologist following her hospitalization but "denies ever being diagnosed with any mental health issues." She claimed she was put in the hospital "falsely" by father and denied being suicidal.

Father claimed that mother slapped him and threw objects at him. He stated that mother had a long history of mental illness "that she refuses to disclose." Father admitted hitting M.A. with a belt once, stating "[w]hen I would strike them it was so fast they never saw it coming." He stated he would flick the two older children in the face with his

7

middle finger, but denied slapping them. He denied any physical abuse of L.A. and stated "[s]he's actually a really good girl."

DCFS interviewed the eldest daughter, E.A., on April 22, 2013. E.A. denied any current concerns about mother's mental health. She stated that L.A. would have "tantrums" when returning from a visit with father, and that mother "struggled with disciplining" L.A., but was otherwise "great" with her. E.A. reported that father was "physical" with her and with M.A. and would pull their hair. Father almost hit her with his cane once at church and had "lost a lot of self control" since his stroke. When asked about L.A.'s school attendance, E.A. noted that L.A. had absences and tardiness around the time father was arrested and suffered a stroke in March 2012 and then was tardy at other times while living with mother because L.A. "refused to get out of bed." E.A. stated she did not have a relationship with father now, that her father did not consider her part of the family, and called her and M.A. "stupid and stupid idiots." She stated she was hit with belts by father weekly when she lived with him and had seen father hit L.A. with a belt "two to three times in the past."

In the jurisdiction report, DCFS concluded that L.A. "appears to be a victim of emotional abuse by her parents who continue to engage in an on-going custody battle. Neither parent seems to realize the negative emotional impact this has on the child and they have failed in the past to obtain much needed therapy" for L.A. The report further noted that father "appears unwilling to abide by the visitation orders and is not being very cooperative" in setting up contact or visitation between mother and L.A. and indicated a concern that father would isolate L.A. from mother "as it appears he has done to her and her siblings in the past."

The jurisdictional/dispositional hearing was held on May 1, 2013. The court sustained the allegation of serious emotional damage under section 300, subdivision (c), and dismissed the allegations under subdivisions (a) and (b). The court ordered L.A. placed with father, with family maintenance services to father and family reunification services to mother. Mother was given unmonitored visitation for two hours, three times

8

per week, with discretion to DCFS to liberalize visitation to permit weekend and overnight visits.

### D. Subsequent Section 388 and Section 342 Petitions

On August 9, 2013, mother filed a petition under section 388 seeking modification of the court's May 1, 2013 disposition order. Mother requested that the court order L.A. placed with her, rather than father, as a result of recent physical abuse allegations against father. Specifically, mother reported that on August 1, 2013, L.A. was taken to the police station by father, at which time she made physical abuse allegations against him. Mother stated she had been enjoying weekend visits with L.A. "without incident" since May 2013 and that L.A. was now afraid to return home to father and refused to do so.

DCFS filed a subsequent juvenile dependency petition under section 342[4] on August 16, 2013, detained L.A., and placed her with mother.[5] The petition alleged jurisdiction under section 300, subdivisions (a) and (b), based on two recent incidents. First, the petition alleged that on August 1, 2013,[6] father physically abused L.A. by striking her face, causing her "unreasonable pain and suffering." Second, on August 13, 2013, mother and father "engaged in a violent altercation in which the father threatened to strike the mother with a cane and threatened to kill the mother, in the child's presence." Father was arrested for violating mother's preexisting restraining order against him.

DCFS also filed a detention report on August 16, 2013. The CSW indicated that the parents signed a visitation agreement on May 8, 2013 (following the original dependency dispositional order), but disputes began "almost immediately, each accusing

---

[4]    Mother withdrew her section 388 petition once DCFS filed the section 342 petition regarding the same incident.

[5]    Because L.A. previously was removed from mother's custody, DCFS did not formally release L.A. to her, but allowed mother to keep L.A. on an "extended visit."

[6]    The police report indicates that this incident occurred on August 1, 2013, while the reports from DCFS list the date as August 2, 2013. The precise date is immaterial for our purposes on appeal.

9

the other of violating the agreement" and making numerous calls to the CSW to complain about each other. The detention report attached a Los Angeles Police Department Injury Investigation report, which discussed both the August 1 and August 13, 2013 incidents. L.A. stated she was home with father on August 1, 2013 when he became angry and slapped L.A.'s face. L.A. cried because it hurt her. She said she wanted to stay with her mother, was upset that her father "gets angry for no reason," and was unable to call her mother because it caused her father to get angry with her. Father stated L.A. was "acting up and threw her dolls [*sic*] clothing across the floor and kicked him so he 'flicked her face' with his middle finger quickly." Father then took L.A. to the police station, stated he "had enough with his child" and demanded the officers "call DCFS to come pick her up he has had it with her." (*Sic*.)

In an interview with a CSW on August 2, 2013, father admitted that he was upset with L.A. and had brought her to the police station "in an attempt to scare her by saying he was going to call DCFS and put her in foster care." Mother was allowed to extend a previously planned weekend visit with L.A. and take her home, with the promise that L.A. would be returned to father the following week. However, mother then refused to return L.A. to father, stating that L.A. was afraid of him. DCFS informed mother that she was in violation of the court's order. However, following the August 13 incident, DCFS agreed to allow mother to continue to care for L.A. on a "slightly longer extended visit."

As for the August 13, 2013, incident, which occurred at L.A.'s school, L.A. stated she was waiting in line for class when she saw her father and "got a little scared cause [sic] he was there." L.A. went back to her mother, who was at the school, and father and mother then got into an argument, during which father told mother, "I want to kick your fucking ass," in front of L.A. Mother also contends father raised his cane in a threatening manner. Mother stated L.A. told her she was afraid of father and did not want to be returned to him.

When asked by the CSW why mother had only recently begun counseling for herself and for L.A., mother cited financial reasons and noted her therapist had made her "see the importance of doing things differently" with L.A. and that she would "work with

10

DCFS in any way possible." Mother stated that she understood the importance of "how her actions influence and affect her daughter's feelings and actions." L.A. stated that she wanted to stay with mother and did not want to live with father.

DCFS recommended L.A. be removed from father's custody and placed with mother, with monitored visitation for father.

*E. Second Detention and Adjudication Hearings*

At the detention hearing on August 16, 2013, the juvenile court found a prima facie case was established for detaining L.A. pursuant to section 300, subdivisions (a) and (b).[7] The court released L.A. to mother pending the next hearing and granted monitored visits with father. Mother was also ordered to ensure L.A. received counseling.

In an interim review report filed September 6, 2013, DCFS noted that mother had been attending weekly therapy sessions starting August 13, 2013, and was "thoroughly engaged in the therapeutic process." L.A. also recently had begun therapy.

DCFS filed its jurisdiction/disposition report in support of the section 342 petition on September 8, 2013. DCFS interviewed L.A. on August 27, 2013. L.A. stated she wanted to remain with mother and have monitored visits with father. L.A. also provided additional detail regarding the incident on August 2, 2013—she was at father's house, playing with her dolls, when she heard father saying, "It's none of your business," over and over. She asked him why he was saying that and then he "just got mad and I threw my dolls [*sic*] clothing at him but it missed." Father then said he was taking her to her mother's house, pulled her left ear and told her to get up, then "started slapping me with one hand on my face from one cheek to the other many times. . . . I was crying and then he told me to pack my things. My dad was very mad." Father then took L.A. to the

---

7   Section 300, subdivisions (a) and (b), provide that a child comes within the jurisdiction of the juvenile court as a dependent when "(a) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent. . . ." or "(b)(1) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child. . . ."

police station. L.A. indicated she wanted to stay with mother and did not want to live with father "because he lies." She also stated she wanted her visits with father "to be monitored because I am not comfortable with my dad because he slapped me and he lied." L.A. also confirmed the events of August 13, 2013, and stated she thought father wanted to hit mother with his cane.

Mother stated that she understood it was wrong of her and father to argue in front of L.A and she would make sure she and L.A. continued to attend counseling. Father denied slapping L.A. He stated that L.A. threw her dolls at him, he was upset, and "decided to scare her by taking her to the police station." He acknowledged that his other daughters, E.A. and M.A., "refuse to have any contact with me," but requested a court order so that they "will be ordered to visit and talk to me." As for the incident at L.A.'s school, father acknowledged that L.A. "looked scared and was shaking when she saw me. I know that [mother] must have turned her against me." Father denied threatening mother or saying anything and claimed that mother "is the one who threatened me and was verbally insulting me."

DCFS concluded that L.A. "appears to be thriving" under mother's care and that there were currently "no concerns and no safety threats or risks" with mother. The report further noted that father "is in complete denial of all allegations against him and refuses to take any responsibility on his actions [*sic*]," instead blaming L.A. and mother for the "ongoing threats/parental conflicts." DCFS recommended that the family needed ongoing supervision by the dependency court "to ensure that the parents comply with all court orders and to ensure that mother continues to be a protective parent by enforcing the restraining order and demonstrating that she is able to act on that in order to prevent any future harm to her child."

At the September 11, 2013, jurisdiction/disposition hearing on the section 342 petition, the court sustained the allegations under section 300, subdivision (b), and dismissed the allegations under subdivision (a). The court terminated the prior order placing L.A. with father, and instead ordered L.A. placed with mother, with family

12

maintenance services. Father was given monitored visitation for three hours, three times per week.

### F. Review Hearing and Closure of Dependency Case

The court set a six-month review hearing pursuant to section 364 for March 12, 2014. In advance of the hearing, DCFS submitted a status review report on March 7, 2014. In the report, the CSW described the progress of the family over the six months following the last hearing. The CSW observed that L.A. had been "friendly and outgoing" during their meetings. L.A.'s teacher reported her comprehension scores in the 75th to 80th percentile, that L.A. was "at grade level academically," and observed no behavioral problems.

L.A. had regular monitored visits with father during this period, which had "generally gone well" but had some issues. She stated to the CSW that "she does not want to see her father as often as she is," which was then two hours, twice a week. L.A.'s therapist reported that L.A. said she "wasn't happy with the way the monitored visits were going," especially when visits were monitored by a paternal aunt, and seems "really, really torn up about the visits with her father and we've had a couple of sessions where she's broken down in tears because she feels afraid of him and she's unable to express that to him." The therapist stated father said things to L.A. that were inappropriate and "does activities that aren't about [L.A.]. They're more about him." Father also sends L.A. inappropriate text messages and photos, such as a photo of his electronic ankle monitor. L.A. stated she "wouldn't really be comfortable being anywhere around her father without a monitor." The visitation coach's log from L.A.'s visits with father (when monitored by a neutral party) reflect father's improvement in verbally praising L.A. and in becoming "less authoritative in his tone," as well as L.A.'s increased ability to express her desires instead of "just doing what the father is asking her to" and in expressing her frustration to father. The coach described most visits as positive and enjoyable for father and L.A. and noted that they seemed to be developing a "stronger bond." However, L.A.'s therapist reported L.A. stated she was "'uncomfortable or scared half the time' during visits with her father that involved a monitor that was not a neutral

13

party (her father's sister). She reports being afraid of 'what happened before,' referring to the physical abuse that occurred when speaking honestly to her father, or when discussing the prospect of being alone with him."

Father was attending domestic violence classes and had attended 11 sessions, but stopped in June 2013 about a month after enrolling. Father then re-enrolled in January 2014 and since then "has been more consistent with his attendance." Father followed a similar pattern with respect to his individual counseling, but had completed the agency minimum of 16 sessions and was now "consistent in attendance and cooperative." The CSW noted that father also was provided referrals for a parenting class, but father claimed he never received the referrals and therefore had not enrolled in or attended that class. Father "continues to express a strong desire to see his daughter."

Mother continued in individual counseling and had "shown a willingness to work on her issues." She also completed a 10-session Practical Parenting Class in December 2013 and was reported to be an "active and attentive" participant.

As of February 5, 2014, L.A.'s attendance at her individual therapy sessions had been sporadic—she attended only five sessions in four months, with no sessions between November 18, 2013, and January 18, 2014. The CSW met with mother and explained that L.A. was required to be in "ongoing, consistent" individual counseling and that the court would be notified if L.A. missed another session. Since that meeting, the counselor reported L.A.'s attendance was "consistent" but also noted mother continued to have a problem with timeliness, bringing L.A. 10 to 15 minutes late on several occasions. The therapist reported mother had expressed interest in continuing to bring L.A. to counseling after the case was closed and that such continued counseling was recommended.

The DCFS report concluded that "the parents have shown very little compliance," noting that, at times, their level of cooperation had been "horrendous and inexcusable," with each parent blaming the other for any problems. "In fact, from the beginning, this case has been little more than a custody dispute with both parents using their daughter against the other to the degree that at one point, [L.A.] told CSW Gotwetter she felt like a 'ping pong ball.'" The CSW further noted that "[b]oth parents have consistently flouted

14

the court's orders." Father had been "extremely verbally abusive" to the CSW and had "inappropriately confronted [L.A.] on issues that more appropriately should have been discussed with mother." When confronted, father "doesn't seem to understand how his behavior is inappropriate." The CSW further stated that mother had not been "much better than father," pointing to the inconsistent attendance and tardiness with L.A.'s therapy, that some of the sessions for L.A. had included mother, rather than L.A. alone as ordered, and continued instances of mother putting L.A. "in the middle" of her anger toward father. Thus, while DCFS indicated it had considered recommending the case remain open for another six months, it concluded that "nothing the department or the court does will ultimately change these parents. [L.A.] has been in the middle for quite a long time, and it's going to stay that way no matter what the court orders." Ultimately, DCFS recommended that the court terminate jurisdiction and split legal and physical custody "50-50 between the parents." Apart from the discussion detailed herein, the report does not contain any further explanation for the recommendation to split custody equally.

At the hearing on March 12, 2014, the court continued the matter and ordered the parties to attend mediation to attempt to reach an agreement regarding closure of the case and a family law order. The court admonished the parents to "try and be reasonable," noting that if they could not agree on a visitation schedule, "I'm just going to pick . . . whatever sounds natural and reasonable whether it's what you like or not." The parties were unable to reach any agreement during the mediation.

At the review hearing on April 29, 2014, DCFS again recommended closing the dependency case with a family law order awarding joint legal and physical custody to the parents. Counsel for L.A. and for mother objected to unmonitored visits or joint custody for father, based on L.A.'s expressed fear of father, and requested sole custody to mother. The court responded that "[i]t sounds like something that can be dealt with in therapy." The court accepted mother's stipulated testimony regarding her concern that father was facing possible deportation and had continuing health problems, as well as that the two older daughters were currently estranged from father.

15

After noting that the 50/50 split custody was recommended by DCFS, the court stated it understood that family law cases "are very serious matters, but they are not dependency matters. . . . [¶] We are dealing with issues of great and severe parental neglect and abuse. That's really the type of cases we deal with here." On the other hand, "the whole gravamen of this case" was "parents not getting along and having to deal with custody issues." The court then stated that "this is a case that needs to close," because it no longer has "the issues that brought us into dependency. Things have settled down and changed according to the reports." The court then concluded "I'm adopting the [DCFS] recommendations. I don't see any reason why we shouldn't. This is a case that should be resolved with 50/50 split of legal custody, physical custody and let the parents work out who gets the child on what and what date [*sic*]."[8] Mother was awarded the primary residence, but the court left it to mother to "work it out with the dad to make sure that he gets his 50/50 share of custody." The court therefore terminated dependency jurisdiction, with exit orders to the family court imposing the 50/50 custody arrangement.[9]

Mother timely appeals the court's April 29, 2014 custody and visitation orders.

---

[8] When this case was initiated in April 2013, father told DCFS and the court that he had moved to Utah and planned to stay there with L.A. However, the record contains some indication that he did not relocate L.A. to Utah, but remained with her in California. It is unclear from the record before us where father was living as of April 2014, when the court ordered joint custody, and neither DCFS nor the court addressed any geographic concerns with 50/50 split custody at that time. We simply note here that any plan by father to move out of state would certainly be relevant to the court's determination of what custody arrangement would serve the child's best interests.

[9] The family had an existing family law case stemming from the parents' dissolution proceedings. As discussed below, upon termination of dependency jurisdiction, the dependency court's "exit orders" regarding custody were entered in the family law case and remain in effect unless and until modified by the family law court. (See section 362.4; *In re John W.* (1996) 41 Cal.App.4th 961, 970-973 (*In re John W.*) [discussing basis for juvenile "exit orders" versus family law custody orders].)

## DISCUSSION

### A. *Standard of Review*

A juvenile court's orders regarding custody and visitation will not be disturbed on appeal absent an abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *In re John W.*, supra, 41 Cal.App.4th at pp. 973.) "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'" (*In re Stephanie M., supra*, 7 Cal.4th at pp. 318-319.)

### B. *Custody and Visitation Orders*

"'When the juvenile court terminates its jurisdiction over a dependent child, section 362.4 authorizes it to make custody and visitation orders that will be transferred to an existing family court file and remain in effect until modified or terminated by the superior court.'" (*In re Chantal S.* (1996) 13 Cal.4th 196, 203.) In making such orders, the dependency court's primary concern must be a determination of "what would best serve and protect the child's interest." (*In re Gabriel L.* (2009) 172 Cal.App.4th 644, 652; see also *John W., supra,* 41 Cal.App.4th at p. 972 ["the court's power under section 362.4 required it to make an informed decision concerning the best interests of the child"] [citations omitted].) "The juvenile court has a special responsibility to the child as *parens patriae* and must look to the totality of a child's circumstances when making decisions regarding the child. [Citation.]" (*In re Chantal S., supra,* 13 Cal.4th at p. 201.)

Here, mother contends that the dependency court's order awarding joint custody and unmonitored contact to father was not in L.A.'s best interest and therefore was an abuse of discretion under the circumstances of this case. We agree. Six months earlier, the court had sustained the allegations in the section 342 petition that father had physically abused L.A. by striking her and had created a risk of future serious harm to L.A. as a result of his "violent conduct" against mother. Since that time, L.A. consistently reported that she was afraid of father, referring to repeated physical abuse, and stating that she was uncomfortable being alone with him and wanted to remain with

17

her mother. In addition, the record contains multiple reports from both L.A. and her sisters discussing father's past physical abuse—including striking them with belts, slapping them, and flicking them in the face—and father admitted his two elder daughters refuse to have any contact with him. Notably, it was not just mother or L.A., but also L.A.'s therapist who raised concerns regarding father's "inappropriate" behavior around L.A. and L.A.'s fear of him, including that L.A. had "broken down in tears" during several sessions "because she feels afraid of him and she's unable to express that to him."

DCFS argues that the court's custody and visitation orders were reasonably supported by the evidence that father had improved his behavior and his relationship with L.A. following the section 342 petition and that mother might be influencing L.A.'s statements regarding her fear of father. In fact, the evidence that "things had settled down and changed," as the dependency court described it, was minimal. True, the neutral visitation monitor reported that father's visits with L.A. generally went well and the two seemed to enjoy themselves and continue to work toward improving their relationship. But there was no evidence that L.A.'s visitation sessions without a neutral monitor (those that were monitored by a paternal aunt) shared that progress; indeed, it was precisely those sessions that L.A. indicated caused her discomfort and fear. Nor was there other evidence suggesting that moving from monitored visits of about six hours a week to unmonitored contact, let alone joint custody, would address or alleviate the concerns L.A. and her therapist raised.

While father had begun some of the court-ordered counseling, his attendance to date had been sporadic and he had completed less than half of his domestic violence classes and no parenting classes. Further, the record contains no evidence about father's participation in these sessions, other than that he was "cooperative," that would support a finding that the risk of abuse was substantially diminished as a result. While we cannot reweigh the evidence on appeal or substitute our judgment for that of the trial court (see *In re Stephanie M., supra*, 7 Cal.4th at pp. 318-319), here, the substantial evidence that immediate unmonitored contact with father would not benefit L.A., and the lack of

18

evidence supporting such contact, compels the conclusion that the court erred in awarding joint custody to father in this case.

We realize in cases such as this, where the longstanding "horrendous" behavior of both parents leaves one scarcely better than the other, determination of a child's best interest is undoubtedly exceedingly difficult. However, the court's ruling at least should reflect its consideration and determination of this key factor. In this case, the court never referred to the best interest of the child, or to L.A.'s circumstances at all, when making its ruling. Instead, it focused on the parents' failure to get along, the fact that the case "needs to close," and the court's opinion that "things have settled down." The court indicated it was adopting DCFS's recommendation because it did not "see why we shouldn't" and further left it to the perennially bickering parents to "work out who gets the child on what and what date."

But simply splitting custody equally because both parents are blameworthy does not meet the court's obligation to make a decision regarding the best interests of the child without other evidence affirmatively supporting that 50/50 division. (See *John W., supra*, 41 Cal.App.4th at p. 974 ["just because custody with neither parent [is] held to pose any danger to the child does not mean that both parents are equally entitled to half custody"]; *In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268 ["joint physical custody may not be in the child's best interests for a variety of reasons"].) We find no evidence in the record, nor did the dependency court cite to any,[10] that would provide a reasonable basis to conclude that joint custody and immediate unmonitored contact between L.A. and father would be in her best interest, particularly over L.A.'s strenuous objection. The court therefore abused its discretion in making such an order.

Similarly, we agree with mother that there was no evidence to support the dependency court's order that the parents "work out" the specifics of custody and

---

[10] In its status review report, DCFS seemed to base its recommendation for joint custody on its frustration with both parents and the conclusion that "nothing the department or the court does will ultimately change these parents." While understandable, such frustration does not lessen the need for a determination of the best interest of the child.

visitation on their own. To the contrary, in addition to the highly embittered and antagonistic nature of the parents' custody dispute generally over many years, the record was replete with each parent's repeated refusals to cooperate with the other and finger-pointing when obligations were not met. This inability to cooperate even minimally includes their failure to reach any agreement regarding custody or visitation during the mediation that took place immediately prior to the review hearing. In fact, the court itself recognized in closing the case that these "parents aren't able to deal with each other on a civil basis." And despite the court's admonition that it would make decisions regarding scheduling if the parents could not, it did not do so. Without any evidence that mother and father would somehow be able to reach an agreement outside of the confines of dependency court, the court's order that they do so lacked any reasonable basis and was not in L.A.'s best interest. The order was therefore an abuse of discretion.

### C. Termination of Jurisdiction

Although both parties suggest that, in the event of a reversal, the case should be remanded to family law court for further proceedings, we decline to do so. Instead, we find it appropriate to set aside the dependency court's order terminating jurisdiction and remand this matter to the dependency court. The court should determine whether, in light of this opinion and the passage of time since the April 29, 2014 order, to retain dependency jurisdiction (§ 364, subd. (c)), or, alternatively, to issue exit orders reflecting its consideration of the best interests of the child.

20

## DISPOSITION

Reversed.  The matter is remanded to dependency court for further proceedings consistent with this opinion.  Until new orders are issued, the current custody and visitation orders are to remain in place to prevent further disruption for the child.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


EPSTEIN, P. J.


WILLHITE, J.

21